IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| A.G., a minor child, by and through her mother and next of friend, K.C., *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 2:05-cv-1090-MEF ) (WO) |
| AUTAUGA COUNTY BOARD OF EDUCATION, *et al.*, | ) ) ) |
| Defendants. | ) |

_____

| | |
|---|---|
| B.H., a minor child by and through his mother and next of friend, D.S., *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 2:06-cv-393-MEF ) (WO) |
| AUTAUGA COUNTY BOARD OF EDUCATION, *et al.*, | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Parents of six minor children bring these two consolidated cases for injuries arising

out of alleged sexual abuse and harassment by a substitute teacher at an elementary school

in Autauga County, Alabama in October, 2004.  Plaintiffs bring their claims against

Defendants Autauga County Board of Education ("ACBE"), Joseph L. Butler ("Butler"),

Dene W. Cleveland ("Cleveland"), and Terry Wright ("Wright").  Pursuant to 20 U.S.C. §

1661 *et seq.* ("Title IX"), 42 U.S.C § 1983, as well as state law causes of action, the Plaintiffs

seek redress.  ACBE, Butler, and Cleveland (collectively "Defendants") filed a Motion for

Summary Judgment (Doc. # 78) on January 26, 2007.[1]  Defendants also filed two separate

Motions to Strike (Docs. # 92 and 93) on March 1, 2007.  For the reasons set forth below,

the first Motion to Strike (Doc. # 92) is due to be DENIED, the second Motion to Strike

(Doc. # 93) is due to be DENIED, and the Motion for Summary Judgment (Doc. # 78) is due

to be DENIED in PART and GRANTED in PART.

## II.  JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331.  The parties do not contest personal jurisdiction or venue, and the Court finds sufficient

factual basis for each.

## III.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[1] Wright, the alleged perpetrator of the sexual abuse, is currently in prison.  He neither joined in the Motion for Summary Judgment nor filed his own motion.  Therefore, the counts against him as alleged in the Plaintiffs' amended complaints (2:05-cv-1090-MEF, Doc. # 52; 2:06-cv-393-MEF, Doc. # 11) will not be addressed.  Furthermore, unless stated otherwise, any reference to the "Defendants" is not intended to include Wright.

and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the

3

other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving parties, establish the following facts:

On October 29, 2004, the six minor Plaintiffs -- five females (A.G., M.H., M.K., D.A., and A.L.) and a lone male (B.H.) -- were fourth grade students at Prattville Elementary School in Autauga County, Alabama. The minor Plaintiffs allege they suffered sexual harassment and abuse at the hands of Wright, a substitute teacher at their school. To properly put in context the events that occurred that day it is necessary to first examine the course of events leading up to the sexual abuse.

On April 5, 2004, Wright, a retired Air Force Colonel, applied to the ACBE to serve as a substitute teacher in the county school system. As part of the licensing process, Wright passed various criminal background checks. On June 11, 2004, the ACBE received Wright's certification from the State Department of Education. With this certification in the hands of

4

the ACBE, Wright was now cleared to teach in county schools. Wright's name subsequently appeared on the September and October substitute teacher list for the Autauga County school system.

On October 20, 2004, Wright was called to serve as a substitute teacher at Prattville Intermediate school. However, at some point in the day, a faculty member approached Principal Angel Garrett ("Garrett") and informed her that Wright had made several students feel uncomfortable by inappropriate touching. Garrett spoke with several students about the touching and confirmed the initial report. All of the students reported that Wright's touching them made them feel uncomfortable. Garrett approached Wright and told him that he should not return the following day. Garrett did not confront Wright about the students' allegations of inappropriate touching.

While the ACBE did not have a written policy, practice or protocol to be followed during an investigation of sexual abuse,[2] the ACBE provided training to their staff regarding

---

[2] The Plaintiffs dispute whether prior to October 2004 the ACBE had a policy regarding sexual harassment of students; the Defendants, however, insist that the ACBE had several policies "applicable to claims of sexual harassment of students before October 29, 2004." Doc. # 91 at 57-58. The Defendants do not provide examples of policies specifically referring to sexual harassment of students, but do point to ones dealing with discrimination based on sex. For example, in a policy adopted on January 25, 1996, the ACBE had a procedure for student grievances "of any nature to include, but not be limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age." Furthermore, the 2004-2005 year ACBE provided an equal education opportunity statement that "[i]t is the policy of the Autauga County Board of Education that no student shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination in any program or activity on the basis of sex, race, color, religion, national origin, age handicapping condition, belief, creed, or ethnic group."

the relevant mandatory reporting law for suspected child abuse and neglect.[3]  Garrett neither

called the police nor contacted the school system's Department of Human Resources

("DHR") in response to what occurred at her school.[4]

Garrett did, however, report what happened to Cleveland, the ACBE's director of

personnel services, and Butler, the ACBE's superintendent.  Garrett spoke first with

Cleveland on the phone.  According to Cleveland's notes of that conversation:

> [Garrett] informed me that a teacher ... reported to her that
> several students had come to her after lunch stating that Mr.
> Wright had inappropriately touched them.  The "touching"
> included stroking their cheeks and hair, rubbing their shoulders,
> etc.  His actions did not include any touching of genital areas.
> Ms. Garrett immediately called the students involved to her
> office and they confirmed what had been reported.

Pl. Ex. 17.  Garrett then spoke with Butler and Cleveland together on a conference call.

During this call, Butler directed Garrett to prepare a written report of her investigation.

Cleveland and Butler conferred on how to proceed.  Butler instructed Cleveland to call the

ACBE's attorney and ask the attorney if Wright could be removed from the substitute list.

On October 22, 2004, Garrett submitted her report to Butler.  Garrett wrote:

---

[3]Ala Code § 26-14-3 (2006)  provides in relevant part:

> All ... school teachers and officials ..., when such child is known
> or suspected to be a victim of child abuse or neglect, shall be
> required to report , or cause a report to be made of the same,
> orally, either by telephone or direct communication immediately,
> followed by a written report, to a duly constituted authority.

[4] In her deposition testimony, Garrett stated her assessment that "[t]here was no
suspected child abuse at my school."  Garrett Deposition at 124.

Each female student gave me an account that Mr. Wright had brushed up against their hair and face and touched them around their waist.   I, then in turn, immediately contacted Mrs. Cleveland at Central Office to inform her of this situation and inquired how she would like for me to handle this situation.

... I gave Mrs. Cleveland a description of the substitute and students and expressed that I did not think they were a behavior problem.  She asked me if I believed what the students said.  I stated that I felt something had happened that made them uncomfortable.

Pl. Ex. 16.   Based on this report, which Butler considered a written finding of the investigation, Butler made the determination that found no improper sexual conduct had occurred.[5]   Butler further concluded that, based on the report, Wright was simply an "ineffective teacher."[6]

Butler then directed Cleveland to remove Wright's name from the substitute list.  On October 25, 2004, the November substitute list was placed in each school's box at the central office with Wright's name omitted from the list.[7]

_____

[5]Incidentally, one set of parents made a complaint to the Prattville Police Department regarding the alleged touching of their daughter, but charges were never brought in connection with the October 20, 2004 incident.

[6]The words "ineffective teacher" did not appear in Garrett's report.

[7]The list was prepared by Cleveland's  secretary, Janie Crawford ("Crawford"), at Cleveland's direction.  Someone from each school was responsible each month for going to the central office and picking up and signing for the monthly substitute list.  Plaintiffs express skepticism that the list was distributed before October 29, 2004, but they present no evidence to support this suspicion. .  The only evidence before the Court – the deposition testimony of Cleveland, Crawford, and Butler, as well as affidavits of Butler and Cleveland – establishes that the November substitute list without Wright's name on it was placed in each school's box at the central office on October 25, 2004.  Therefore, even viewing the

The same day, on October 25, 2004, Wright appeared at Prattville High School to serve as a substitute.  Lori McVay ("McVay"), a parent of one of the girls touched at the intermediate school the previous week, happened to be a teacher at Prattville High School.  Following the incident at the intermediate school, McVay had relayed to some of her colleagues what had happened to her daughter.  When one of those colleagues met Wright in the hallway of Prattville High School – Wright was lost and introduced himself to a teacher in order to get directions – two teachers went to the school's assistant principal, Lee Hicks ("Hicks"), and informed Hicks that there was a possible conflict between a substitute teacher and a faculty member.  Hicks then called Garrett at Prattville Intermediate School and left a message.[8]

Garrett returned Hick's call to the high school's principal, Roger Stifflemirer ("Stifflemirer").  According to Stifflemirer, Garrett told him that Wright was not effective as a substitute teacher but did not go into any detail why this was so or how Garrett knew that Wright was ineffective.  After speaking with Garrett, Stifflemirer walked down to Wright's classroom.  Peering through the window, Stifflemirer "observed the students, some turned facing each other, multiple conversations going on with very little control in the classroom." Stifflemirer Dep. 39.  Stifflemirer then summoned Wright into his office and informed him

_____

evidence before the Court in the light most favorable to the plaintiffs, there is no genuine issue as to this material fact.

[8] According to Hicks' deposition testimony, the teachers told Hicks to call Garrett but did not go into detail why he should do so.

that "we had the remainder of the day covered and that I would pay him for the whole day,

but I needed for him to sign out and leave."  Stifflemirer Dep. at 41.  Once he sent Wright

home, Stifflemirer called Cleveland to tell her that he dismissed Wright from his school.  At

no time during the conversation did Cleveland tell Stifflemirer that the November substitute

list was in the high school's box at the central office or that Wright's name had been removed

from the list.

On October 29, 2004, Cleveland called the DHR to report the October 20, 2004

incident.  It is unclear exactly what time of day the call occurred but there is no evidence to

suggest that Cleveland called DHR after the October 29th incident at the elementary school

became known to Cleveland.  Cleveland spoke with an intake worker at DHR.[9]  The intake

worker, Kevin Smith ("Smith"), memorialized the conversation and forwarded the report to

his supervisor.[10]  While Smith's notes do not indicate the time of day of Cleveland's call,

Smith discussed how Cleveland "reported concern regarding Terry Wright, white male, who

was a substitute teacher in the Autauga school system."  Exb. 39.  The notes recounted:

> According to Ms. Cleveland, Mr. Wright served as a substitute
> last week (Oct. 20) at the Intermediate School.   Mr. Wright
> made three female students uncomfortable by reportedly

---

[9] Cleveland testified at her deposition that she spoke with Katie Russell ("Russell"), the DHR's director.  However, Russell testified that she did not recall any conversation with Cleveland about allegations involving a teacher and students within the Autauga County school system.  Russell did, however, receive information passed on to her by the intake worker.

[10] The exhibit containing the notes is subject to Defendants' Motion to Strike.  For reasons discussed further on in this opinion, that motion to strike is due to be denied.

brushing his hand on their hair and neck.  He also kissed one of the students on the forehead when she came out of the bathroom.    Ms. Cleveland said she had no information indicating that Mr. Wright made inappropriate comments to the girls.  Ms. Cleveland said it could be possible that Mr. Wright was just being overly friendly and did not have sexual motivations.

... Ms. Cleveland stated that she is not sure whether Mr. Wright specifically had sexual intentions by his actions with the female children at the Intermediate School.  She also stated that she "did not want to ruin his reputation" if he was just being overly friendly.

Cleveland testified at her deposition that, while she did not know whether a crime had been committed on October 20, 2004, she called DHR on October 29, 2004 pursuant to her understanding of the law regarding mandatory reporting of sexual abuse and child neglect.

Also on October 29, 2004, Toynette Bivens ("Bivens"), a fourth grade teacher at Prattville Elementary School, became ill.  The school day had already started and when Bivens approached the school's principal James Abraham ("Abraham"), about finding a substitute, Abrahams offered to help her find a replacement.  Abraham took out his substitute list, which happened to be the list from September.  Abraham started calling names on the list, beginning with the names with which he was familiar.

Abrahams had trouble finding an available substitute.  Not only was it a Friday – a difficult day to secure an available substitutes – but the day had already commenced, making finding someone all the more challenging.  Abraham's assistant principal, Nancy Jackson ("Jackson"), pulled out her substitute list and began calling names.  Jackson used the

10

October list.  After Abraham contacted between 20-25 people on his list, all of whom were unavailable, he finally got to Wright.  Wright was available.  Abraham was not aware at the time of any reason not to use Wright as a substitute teacher.  Wright arrived soon thereafter to substitute at Prattville Elementary School for the  remainder of the day.

With Wright now in command of the fourth-grade classroom, the students started the afternoon by watching a movie.  As the lights were off and the movie was being played to the students, Wright's alleged misconduct began.  In their deposition testimony, the minor Plaintiffs allege, among other things, the following:

**A.L.**

When she went to get a Babysitter's Club book from the bookcase, Wright "put [her] in his lap."  A.L. Dep. at 55.

As A.L. sat on his lap, Wright touched her "on [her] butt."  *Id.* at 56.

Wright put A.L. in his lap a second time.  According to A.L., "He touched me around my neck and he was holding my waist.  And he was kind of like bouncing me up on his leg."  *Id.* at 60.

**A.G.**

Wright brought her into his lap by pulling her from under her shorts.  A.G. Dep. at 68.

While she sat on his lap, Wright touched her on the neck, back, between her legs and around her chest.  *Id.* at 72-73.

**M.K.**

Wright pulled her onto his lap.  M.K. Dep. at 46.

While Wright had her on his lap, he touched her on her breast and her back and did so underneath her shirt.  *Id.* at 51.

As she tried to get up, Wright kept pulling her down.  *Id.*

**M.H.**

Wright touched her on her chest over her shirt.  M.H. Dep. at 41-42.

He put her on his lap.  *Id.* at 57.

He rubbed her shoulders and touched her upper thigh and waist.  *Id.* at 65-67.

**D.A.**

She sat in Wright's lap.  D.A. Dep. at 72.

He pulled her arm and forced her onto his knee.  *Id.* at 74.

He touched her arm, breast, neck, lower back, and hair.  *Id.* at 76, 78.

**B.H.**

When B.H. asked to go to the restroom, Wright touched him.  B.H. Dep. at 66. Wright "started rubbing on my back and then he tried to touch me on my chest."  *Id.* at 69.


Later in the afternoon, M.H. went to Jackson and told her that Wright had touched her. Jackson told Abraham about the allegation.  Abraham spoke with M.H., and using information relayed to him by M.H., also questioned two other students.  Abraham approached Wright and told him to leave the campus.  Meanwhile, Jackson stayed with the class as Abraham contacted the Prattville Police Department.  After calling the police,

Abraham phoned the ACBE's central office to alert them to what had just occurred at his

school.  Abraham also called the parents of the students involved.

On October 31, 2004, Butler sent a memorandum to all principals in the Autauga

County school system with the subject line "Teachers' Substitute List."  The memorandum

stated:

> You now have the latest copy (November 2004) of the Autauga
> County Board of Education Teachers' Substitute List.  Please
> instruct whoever is responsible for getting substitute teachers
> (whether it is you or your designee or teachers themselves) in
> your school to destroy all previous lists and to use only the
> current list.  Make certain that all teachers have a copy of the
> November 2004 Teachers' Substitute List.
>
> Please announce at your faculty meeting on Monday that no one
> is to call Terry Wright to substitute in our schools.  You are
> instructed to take all precautions to insure that this individual
> does not enter any of our school buildings or property.

Exh. 18.

On April 28, 2006, Wright pled guilty to seven counts of sexual abuse the first degree

for the conduct that occurred at Prattville Elementary School on October 29, 2004.[11]

On November 14, 2005, the parents of A.G., D.A., A.L., M.K., and M.H. filed on

behalf of their minor children a complaint against the ACBE, Butler, and Wright.  On May

1, 2006, the parents of B.H. filed on behalf of their minor child a complaint against the

ACBE, Butler, and Wright.  On June 16, 2006, the parents of B.H. filed an amended

---

[11] The criminal charge brought on behalf of B.H.'s was dismissed.

complaint to include claims against Cleveland. On June 23, 2006, this Court entered an order consolidating these two actions for all further proceedings. On June 27, 2006, the parents of A.G., A.G., D.A., A.L., M.K., and M.H. also filed an amended complaint to include claims against Cleveland.

On January 9, 2007, Defendants filed a motion requesting the filing of motions for summary judgment under seal. On January 16, 2007, this Court granted the Defendants' motion and ordered that all motions for summary judgment, as well as any accompanying briefs, evidentiary submissions, be filed under seal.[12] On January 26, 2007, Defendants filed the instant Motion for Summary Judgment (Doc. # 78).

## V. DISCUSSION

### A.    *Motion to Strike*

In two separate motions to strike, Defendants challenge exhibits submitted by the Plaintiffs in response to the motion for summary judgment. In their first Motion to Strike (Doc. # 92), Defendants challenge three newspaper articles from the *Montgomery Advertiser* dated November 2, 2004, November 3, 2004, and February 16, 2005. In their second Motion to Strike (Doc. # 93), Defendants challenge an internal DHR document.

Defendants have not cited any legal authority for the relief they request; nevertheless,

---

[12] This Court had previously entered a Protective Order on May 8, 2006, which directed the parties as follows: "Any filing with attached deposition transcript (or portions thereof) in which the identities of the minor plaintiffs are disclosed or any records or exhibits concerning minor plaintiffs or information designated as 'Confidential Information' shall be filed under seal." Doc. # 32 at 2.

this Court will ascertain whether their arguments are well-founded under the applicable law. Because "a nonmoving party, opposing a motion for summary judgment . . . cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial," *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), the issue is whether the evidence would be admissible in some form at trial. *See, e.g., Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1530 & n.11 (11th Cir. 1993).

Starting the analysis with the newspaper articles, Defendants argue that "[b]ecause these articles are not sworn statements and the author was not sworn at the time he wrote them, they are inadmissible evidence." Doc. # 92 at 2. Although the articles were not sworn statements, the newspaper articles themselves were authenticated through the deposition testimony of the articles' author, Walter Roney, Jr., a writer for the *Montgomery Advertiser*. More importantly, Defendants have not made an argument that the events detailed in the articles could not be proven through admissible evidence at trial, *see, e.g., Hosea v. Langley*, Case No. 04-cv-605-WS-C, 2006 U.S. Dist. LEXIS 5935 at * 32-33 (S.D. Ala., Feb. 7, 2006), and therefore the motion to strike these newspaper articles is due to be DENIED.

Moving on to the internal DHR document, Defendants argue that this evidence should be stricken because it was improperly produced. Exhibit 39 is a document written by a DHR intake worker that summarizes the conversation that intake worker had with Cleveland on October 29, 2004 concerning the events that took place at Prattville

Intermediate School on October 20, 2004.   Defendants argue that because the document may fall under the rubric of "confidential" pursuant to Alabama statute,[13] and, consequently, should have not been summarily produced by DHR,[14] Plaintiffs should not be able to submit the document as evidence in opposition to their motion for summary judgment.   Defendants do not contest the document's authenticity or its admissibility.   While the Defendants may now wish that the DHR had followed its own rules in seeking a protective order and challenging the request for production, the fact that DHR did not take that course of action and produced the document to the Plaintiffs is not, in any conceivable sense, grounds for striking this evidence as submitted by the Plaintiffs.   Therefore, the motion to strike the DHR document is also due to be DENIED.

### B.     *Motion for Summary Judgment*

#### 1.     *Title IX*

Count One of both of the first amended complaints alleges unlawful discrimination by the ACBE on the basis of sex and in violation of Title IX.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

---

[13] Alabama Code § 38-2-6 provides:  "All case records of recipients of, and applicants for, assistance [by state and county Departments of Human Resources] ... shall be considered confidential and not public writings and shall not be subject to public use or inspection."

[14] Defendants argue that "[u]nder Alabama Rule of the Department of Human Resources 660-1-6-.03, a subpoena issued in a case not referred by DHR or not involving program-related fraud investigations, like the one here, shall be resisted by apprizing the court of the relevant law and asking for a judicial determination or by filing a motion for protective order."  Doc. # 93 at 4.

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "The Supreme Court has recognized an implied right of action under Title IX for cases involving intentional sexual discrimination, and it has held money damages are available in such lawsuits." *Sauls v. Pierce County Sch. Dist.,* 399 F.3d 1279, 1283 (11th Cir. 2005) (citing *Franklin v. Gwinnett County Public Sch.*, 503 U.S. 60, 65 (1992). Furthermore, "a teacher's sexual harassment of a student constitutes actionable discrimination for the purposes of Title IX." *Id.* (citing *Franklin*, 503 U.S. at 74-76).

The Eleventh Circuit – which, for cases involving teacher-on-student harassment uses as its guidepost the Supreme Court's analysis in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, (1998) – has held that "Title IX plaintiffs ... seeking to recover damages against a school district for teacher-on-student sexual harassment must establish two things to survive summary judgment: (1) a school district official with the authority to take corrective measures had actual notice of the harassment; and (2) the official with such notice was deliberately indifferent to the misconduct." *Sauls*, 399 F.3d at 1284.[15]

As an initial matter, the Defendants contest whether Cleveland, who was the director

---

[15] A school district cannot be held liable under Title IX for a teacher's harassment on the basis of either constructive notice or respondeat superior. The United States Supreme Court made clear that it would "frustrate the purposes" of Title IX "to permit a damages recovery against a school district for a teacher's sexual harassment based on principles of *respondeat superior* or constructive notice, i.e., without actual notice to a school district official." *Gebser*, 524 U.S. at 285.

of personnel services, could be "a school district official with the authority to take corrective measures."   Specifically, the Defendants argue that only the superintendent or the ACBE itself has such authority.  To this end, the Defendants cite *Floyd v. Waiters*, 133 F.3d 786 (11th Cir. 1998), *vacated*, 525 U.S. 802 (1998), *reinstated*, 171 F.3d 1264 (11th Cir. 1999).[16] In *Floyd*, the Eleventh Circuit found that, under Georgia law, "[t]here was simply no notice ... to the school board that enforcement responsibilities under Title IX and, in turn, the power to bring monetary liability onto the school district would extend beyond the superintendent and school board to lower employees."  *Id.* at 792.[17]  Given that the statutory schemes delineating the powers of the school board and superintendent are remarkably similar in

---

[16] *Floyd* was vacated by the United States Supreme Court for further consideration in light of the Supreme Court's ruling in *Gebser*, 524 U.S. 274.  On remand, the Eleventh Circuit reinstated its prior decision and opinion.  For that reason, this Court will focus on the reasoning supplied by the Eleventh Circuit in its first *Floyd* opinion,  133 F.3d 786 (11th Cir. 1998).

[17] The Eleventh Circuit reached this conclusion because "[f]or the law to be otherwise would be cumbersome and costly given the number of supervisors and employees within a school system."  *Id.* at n.11.  The Eleventh Circuit elaborated:

> We do not think that school districts, in reality have actual knowledge – the knowledge to support potentially million-dollar liability for the school district – whenever, for example a deputy assistant director of transportation (but no one higher-up) may know that a bus driver is harassing someone or the foreman (but no one higher-up) of the district's emergency plumbing crew has knowledge of misconduct, and these supervisors could fire (but do not) the harassers.

*Id.*

Georgia and Alabama[18] and the holding in *Floyd*, the appropriate school officials in this case to whom actual notice of a Title IX violation must be made are solely by Butler and the ACBE.[19]

The conclusion that Butler, and not Cleveland, is the appropriate school official does not alter the Title IX analysis as the Defendants do not seriously dispute that Butler had actual notice of the events that took place at the intermediate school on October 20, 2004. What the Defendants do dispute, however, is whether Butler had actual notice of the sexual abuse occurring at the hands of Wright because Defendants view the October 20, 2004 incident at the intermediate school as different in scope and context from what occurred at

---

[18] *Compare* Ga. Code § 20-2-109 ("The local school superintendent shall be the *executive officer* of the local board of education; ... it shall be the local school superintendent's duty to enforce all regulations and rules of the State School Superintendent and of the local board according to the *laws of the state and the rules and regulations made by the local board* that are not in conflict with state laws ...") (emphasis added) *with* Ala. Code § 16-9-13 ("The county superintendent of education, as the *executive officer* of the county board of education, shall see that the *laws relating to the schools, the rules and regulations of the state and county boards of education* are carried into effect.) (emphasis added). Given that "when a school district accepts funds per Title IX, the school distrist, in effect, makes the Title IX standard part of its own regulations," *Floyd*, 133 F.3d at 791, and Georgia code gave the local school superintendent the power to enforce the laws of the state, the Eleventh Circuit found that, under Georgia law, the local school superintendent was incorporated into the statutory scheme of Title IX. *Id*. at 792. This Court makes a similar conclusion about Alabama law: the county superintendent is incorporated into the statutory scheme of Title IX.

[19] Admittedly, one of the "performance responsibilities" for Cleveland's position as Director of Personnel Services is to "[s]erve as the school system's designee for compliance with federal regulations regarding ... Title IX." Plaintiff's Exh. 7. However, there is nothing to indicate that Cleveland had the necessary "enforcement responsibilities" discussed in *Floyd*.

the elementary school on October 29, 2004.  In other words, because the October 20, 2004

incident was not a sexual crime, there is no actual notice of any Title IX violations.

In this regard, the Defendants expend significant effort in characterizing Wright's

actions at the intermediate school as non-sexual:

> These are young children.  Elementary teachers who give their
> students a hug or a pat on the back are not sexual predators.
> When did brushing a young child's hair out of his/her face
> become evidence that the adult could be a sexual predator?
> Accepting the plaintiffs' attorneys' argument, knowing that a
> retired Air Force colonel has a parking ticket is notice that the
> retired colonel is a future axe murderer.

Doc. # 91-1 at 86.  The Court finds this argument naive and offense, particularly given the

context in which the touching occurred.  When one examines the actual allegations of

Wright's conduct on October 20, 2004, the Defendants analogy with the parking ticket fails

miserably.  Looking just at what Butler had notice of regarding the October 20, 2004 incident

and adding the wrinkle that Wright had attempted to work at the high school on October 25,

2004, the context fully emerges.  An older male teacher made several female students

uncomfortable by brushing up against their hair and face, touching them around their waist,

and even rubbing their shoulders.  This behavior alarmed these young children enough that

they alerted a teacher about it.   Moreover, one set of parents filed a criminal complaint as

a result of these acts.

While the Defendants remain confident that the touching was not sexual in nature,

such behavior by a male teacher would raise alarm bells to the average person and certainly

should seemed suspicious to an educational professional like Butler. To argue that there was no cause for alarm is disingenuous, as the behavior was enough to prompt Butler to consult the ACBE's attorney, ask Garrett to put her findings in written form, and ultimately remove Wright's name from the substitute teacher list. It seems unlikely that Butler would have called for such action if Wright's behavior was as benign as committing a parking violation. The incident at the intermediate school on October 20, 2004 may not have amounted to sexual abuse, but a reasonable jury could find that it amounted to sexual harassment, conduct from which Title IX offers protection. Therefore, a reasonable jury could find that Butler had notice of the Title IX violation occurring at the hands of Wright.

The next issue for assessing the Title IX liability of the school district is whether the official with notice – Butler – acted with deliberate indifference to the misconduct. *Sauls*, 399 F.3d at 1284. "[A] school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing [students]." *Id.* at 1285 (citing *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000). Instead, the deliberate indifference standard requires a response to reports of misconduct that is "clearly unreasonable in light of the known circumstances.*" Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999).

The Defendants argue that because Butler took some remedial action – in particular, ordering Garrett to produce a written report, removing Wright from the substitute list, and placing the revised November list in each school's box at the central office– the Plaintiffs'

21

allegation of deliberate indifference fails.  Defendants analogize the facts of this case with those of *Davis*, 233 F.3d 1367.  In *Davis*, a physical education teacher sexually molested three seventh-grade students.  Another student, who was not a party to the case, had previously lodged a complaint against the teacher for incidental touching during a game of touch football – the teacher touched the student's buttocks when the student, who was playing center, hiked the ball to the teacher, who was playing quarterback.[20]  The school officials in *Davis* came to the conclusion that there was no sexual misconduct with the non-party student, but notwithstanding this determination instituted the following corrective measures: questioning the teacher, removing the student from the after-school physical education class, forbidding the teacher from being alone with the student or any other female student, and conducting repeated follow-ups with the student to make sure the student did not have further complaints.  The Eleventh Circuit found that in these circumstances, even though the investigation was unsuccessful in ferreting out evidence of Title IX discrimination suffered by the other students at the hands of the teacher, the school officials' actions did not amount to deliberate indifference.

In another case cited by the Defendants, *Sauls*, 399 F.3d 1279, a school official was faced with anonymous reports of a female teacher having sexual relations with underage male students.  When the first report came in October 1998, the principal interviewed the

---

[20] The teacher also attempted to touch the student while she was drinking at the water fountain.

relevant parties and -- despite receiving denials from both the student and teacher – issued a warning to the teacher to avoid situations that could be perceived by others as inappropriate. When another tip came in via an anonymous email in March 2001 – this time alleging inappropriate relations between the same teacher and several students who were no longer students at the school – the same official, now serving as assistant superintendent, "admonish[ed] [the teacher] both orally and in writing, and directed her to avoid even the appearance of impropriety when dealing with students .... [as well as] instructed [the teacher] to avoid situations where she would be alone with male students." *Id.* at 1286. Finally, when a third phone call in June 2001 tipped off school officials that the teacher's car had been parked in the woods next to the car of the plaintiff – a male student of the teacher – the school official contacted the Professional Standards Commission and asked them to investigate the teacher. The official also notified the board of education and the local police department about the recent allegation, instructed the new high school principal "to closely monitor [the teacher and the student] to prevent any unnecessary contact between the two, and to report any suspicious behavior." *Id.* at 1287. School officials questioned the student directly and the student lied about his relationship with the teacher. Once school officials found "concrete evidence of an inappropriate relationship" they confronted the teacher and the teacher resigned, surrendering her teaching license in the process. With respect to each allegation in *Saul*, the Eleventh Circuit found that the "Title IX claim fails under the deliberate indifference standard." *Id.*

23

Thus, while the Defendants seek to characterize the deliberate indifference standard as permitting an extremely low threshold of action on the part of Butler, the context and the scope of the action matters. Clearly, Butler and the ACBE would not be required under the deliberate indifference standard to completely thwart any and all discrimination by Wright, but, it is not enough to simply say they did something. Again, as the United States Supreme Court held, deliberate indifference occurs when a response to reports of misconduct is "clearly unreasonable *in light of the known circumstances*." *Davis*, 526 U.S. at 648 (emphasis added). In the instant case, while Garrett wrote a written report of the incident that occurred at her intermediate school, she did not question Wright directly about the touching and Butler did not direct her to do so. Furthermore, although Butler contends that he removed Wright from the substitute list simply because Wright was an "ineffective teacher," such a description does not appear once in Garrett's report of the October 20, 2004 incident.

While the November substitute list was placed in each school's box at the central office on October 25, 2004 – and the Court finds that the Defendants have sufficiently established this fact through affidavit and deposition evidence – it is also clear from the evidence put forth that Butler did nothing prior to October 29, 2004 to ensure that schools in his school system received the updated substitute list and did not use prior lists on which Wright's name appeared. Given that Wright was clearly eager to continue to substitute as he appeared at Prattville High School on October 25, 2004, it is unreasonable in light of the circumstances that Butler did not direct all principals and teachers to avoid contacting Wright

24

as a substitute.  In contrast, the actions of the school officials in *Davis* and *Saul* were

proactive, even if ultimately ineffective.  In summation, the Plaintiffs have created a genuine

issue of material fact whether Butler acted with deliberate indifference.  Therefore, summary

judgment is due to be DENIED as to the Title IX claims brought against the ACBE in Count

One of the Plaintiffs' amended complaints.

### 2. Section 1983

In Count 2 of both of the amended complaints, Plaintiffs allege that Butler and

Cleveland violated their constitutional right to be free from sexual harassment and abuse in

a school setting and bring these claims under 42 U.S.C § 1983.[21]  Given that Count II alleges

---

[21]  Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

As section 1983 provides no substantive rights and, instead, provides a cause of action for
alleged  violations of constitutional rights or substantive rights provided by other federal
statutes, it is necessary to identity such a constitutional or substantive right.  Defendants
assume that Plaintiffs base their section 1983 claim on a violation of Title IX and, therefore,
the section 1983 claim fails.  Plaintiffs, however, specifically invoke "a substantive due
process right to be free from sexual harassment." Doc. # 83 at 55 (citing *Doe v. Taylor Indep.
Sch. Dist.*, 15 F.3d 443, 450-52 (5th Cir. 1994).  Plaintiffs also invoke their "constitutional
right to be free from unlawful sexual harassment in public schools," Doc. # 83 at 55 (citing
*Cross v. Alabama Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507), which
this Court presumes to assert an equal protection right under the Equal Protection Clause of

a cause of action against Butler and Cleveland in their individual capacities,[22] it is first necessary to discuss any defenses of qualified immunity.

Defendants Butler and Cleveland argue that the doctrine of qualified immunity bars Plaintiffs claims of unlawful sexual harassment and sexual abuse.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  *Accord, Hope v. Pelzer,* 536 U.S. 730 (2002).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted); *see also Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003).

To receive the protections afforded by qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the

---

the Fourteenth Amendment.

[22] Defendants inexplicably devote significant energy in their briefs explaining why the Plaintiffs' section 1983 claim fails specifically against ACBE.  However, the Plaintiffs' amended complaints allege that section 1983 provides a remedy for constitutional violations by Butler and Cleveland, and not by ACBE.   Furthermore, Plaintiffs' clarify in their response to the motion for summary judgment that Count II of their amended eight count complaint alleges a claim based on 42 U.S.C. § 1983 "against Defendants Butler and Cleveland."

allegedly wrongful actions occurred." *Id.* (internal quotation marks omitted).  Based on the allegations of the case it would appear that Butler and Cleveland were so acting.

The next step in the qualified immunity analysis is the determination of whether the plaintiff's allegations, if true, establish a constitutional violation.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

In the instant case, the Court must determine whether the Plaintiffs' allegations and evidence could support a claim of a violation of their substantive due process right to be free from sexual abuse under the Due Process Clause of the Fourteenth Amendment or a claim of violation of equal protection right to be free from sexual harassment under the Equal Protection Clause of the Fourteenth Amendment.  While the  Plaintiffs do not delineate their theory of how Butler and Cleveland violated their substantive due process or equal protection rights, presumably it is in a supervisory capacity, as neither Butler nor Cleveland participated in the alleged sexual abuse or sexual harassment of the Plaintiffs.

It is established in the Eleventh Circuit that Butler and Cleveland would not be liable under section 1983 for the unconstitutional acts of their subordinate, Wright, on the basis of respondeat superior or vicarious liability. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.

27

1999) (citing and quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)).

Nonetheless, it is possible to make a claim against a supervisory official under section 1983

> when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.

*Id.* (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).  Additionally, another

means of establishing the causal connection would be when the supervisory's improper

"custom or policy ... results in deliberate indifference to constitutional rights."  *Id.* (quoting

*Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)).

Here,  the actual deprivation of the Plaintiffs' constitutional right to be free from

either sexual abuse or harassment occurred only once, on October 29, 2004, and was an

isolated occurrence.  Therefore, viewing the facts in a light most favorable to the Plaintiffs,

this deprivation was not "of continued duration" sufficient to notify either Butler or

Cleveland.  For these reasons, a reasonable jury would find that there was not a causal

connection between the actions of Butler and Cleveland and the actions of Wright on October

29, 2004.[23]

---

[23] The Plaintiffs did not identify a custom or policy of Butler and Cleveland, specifically, such that a causal connection could be made using that approach.

While there is a seeming inconsistency where this Court found a genuine issue of material fact as to whether Butler acting with deliberate indifference to Wright's misconduct on October 20, 2004 in regards to the Title IX claim yet not finding a causal connection in the qualified immunity analysis for the section 1983 claim, the focus of the two claims is substantively different. In the Title IX claim, the Court examined whether Butler acted with deliberate indifference to Wright's conduct generally. In other words, by having actual notice of Wright's misconduct at the intermediate school on October 20, 2004, did Butler act with deliberate indifference to Wright's conduct? By contrast, when analyzing in the context of qualified immunity whether a constitutional violation occurred, the attention is on the plaintiffs' actual constitutional deprivation. Butler and Cleveland became aware of the deprivation of the Plaintiffs' constitutional rights on October 29, 2004, and, therefore, the deprivation was an isolated incident.

Given the finding that a causal connection cannot be made, the Plaintiffs' allegations and evidence cannot support a claim of either a violation of their substantive due process right to be free from sexual abuse or a claim of violation of equal protection right to be free from sexual harassment. For those reasons, Butler and Cleveland are afforded qualified immunity[24] as to the section 1983 claims and the Motion for Summary Judgment is due to be GRANTED for Count II of the Plaintiffs' amended complaints.

---

[24] Due to the Court's finding regarding qualified immunity, it is unnecessary to discuss Butler and Cleveland's contentions that they should be afforded federal immunity under the "No Child Left Behind" Act.

### 3. State Law Claims

The Plaintiffs amended complaints allege the following state law causes of action against Butler and Cleveland: (1) negligence and/or wantonness; and (2) negligent and wanton hiring and/or retention.  Before discussing Butler and Cleveland's liability, it is necessary to address Butler and Cleveland's argument that they should be afforded state-agent immunity from these claims.

The Constitution of Alabama provides, "[T]he State of Alabama shall never be made a defendant in any court of law or equity."  Ala. Const. art. I, § 14.  This provision affords immunity to State agents in their individual capacities under certain conditions.  *See Wood v. Kesler*, 323 F.3d 872, 883 n.19 (11th Cir. 2003).  The Alabama Supreme Court recently restated the law of State-agent immunity.  *See Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality opinion); *see also Ex Parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000) (adopting the restatement enunciated in *Cranman*). That restatement provides, in pertinent part:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>  . . . .
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in . . . educating students.

*Cranman*, 792 So. 2d at 405.  *Cranman* also provides, however, that "a State agent *shall not* be immune from civil liability in his or her personal capacity . . . (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under

30

a mistaken interpretation of the law." *Id.*

The Alabama Supreme Court has applied a burden-shifting process to resolve claims of State-agent immunity:

> In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.

*Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006) (citations omitted). The Court finds that Butler and Cleveland were exercising judgment in the discharge of their duties in educating students.[25] The burden thus shifts to Plaintiffs to show that Butler and Cleveland acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority.

Plaintiffs do not allege that Butler and Cleveland acted beyond their authority,[26] but instead attempt to demonstrate that Butler and Cleveland acted willfully and in bad faith. The Plaintiffs do so by asserting that "Defendants knew the proper course of conduct ... [and t]he evidence is equally clear that defendants willfully failed to follow any portion of the

---

[25] Plaintiffs seemingly concede this first part of the burden shifting analysis as their argument against the application of state-agent immunity focuses solely on whether Butler and Cleveland acted willfully, maliciously, or in bad faith.

[26] Even though the Plaintiffs do not address the issue of acting beyond authority, it is worth noting that such an argument would be inapposite as the ACBE did not have a policy, practice or protocol to be followed during an investigation of sexual abuse. *See Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003) ("A State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.").

proper course of conduct." Furthermore, the Plaintiffs assert that "Defendants' evidentiary fabrications on October 29, []2004 and thereafter establish [] the bad faith of Defendants in following the proper course of conduct." Doc. # 83 at 60. The crux of the Plaintiffs' argument is that because Cleveland called the Department of Human Resources on October 29, 2004 to report the October 20, 2004 incident that she was covering her tracks and this indicates bad faith.[27] Plaintiffs argue, "Defendants knew exactly how to respond and they willfully chose not to respond." *Id.*

While this Court found that a reasonable jury could find that there was a genuine issue of material fact as to whether Butler acted with deliberate indifference as to the Title IX claim, the Plaintiffs have not established by any evidentiary means that Butler or Cleveland acted willfully or in bad faith. Had the Plaintiffs been able to cast doubt on what time Cleveland called the Department of Human Resources – in other words, whether it was before or after Cleveland learned of the abuse that took place at the elementary school that day – then, perhaps, there would be a genuine issue of material fact as to whether Cleveland acted in bad faith. However, in the absence of any evidence to the contrary, Cleveland's deposition testimony is deemed credible. Moreover, the Plaintiffs do not establish bad faith or willful action by Butler *prior* to October 29, 2004 simply by demonstrating that Butler

---

[27] Plaintiffs also repeat the allegation that the November substitute list was not placed in each school's box at the central office on October 25, 2004. The Plaintiffs, however, fail to present any evidence refuting the sworn deposition testimony and affidavit evidence put forth by the Defendants establishing this fact. On the record before it, the Court cannot find any genuine issue as to this admittedly material fact.

acted with diligence and haste to rectify the situation *after* October 29, 2004 by issuing a memorandum to his principals to use the November substitute list and avoid calling Wright. Because the Plaintiffs fail show that the State agents Butler and Cleveland acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority, both Butler and Cleveland are entitled to state-agent immunity as to the state law claims leveled against them. For those reasons, the Motion for Summary Judgment as to Counts III and IV are due to be GRANTED.

## VI. CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) The Motion to Strike (Doc. # 92) is DENIED.

(2) The Motion to Strike (Doc. # 93) is DENIED.

(3) The Motion for Summary Judgment (Doc. # 78) is DENIED in part and GRANTED in part as set forth above. Therefore, Count One of the Plaintiffs' amended complaints in which the Plaintiffs allege Title IX claims against the ACBE survives summary judgment.

DONE this the 11th day of May, 2007.


_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE